## MURPHY v. BOOTH.

No. 1990.   Decided August 4, 1909 (103 Pac. 768)

1. MALICIOUS  PROSECUTION—INSTRUCTIONS—MISLEADING  INSTRUC-
TION.   Where the only evidence, in an action for malicious prose-
cution, as to any claim for moneys, was one for money due
from plaintiff to a corporation, of which defendant was mana-
ger, the instruction that, if the jury "find from the evidence
that defendant caused plaintiff to be arrested for the purpose of
assisting defendant in collecting a claim for moneys which de-
fendant thought he had against plaintiff, . . . then it was
begun maliciously," could not have been understood by the
jury to refer to some personal claim of defendant, not mention-
ed in the evidence.   (Page 291.)

2. MALICIOUS PROSECUTION—EXEMPLARY DAMAGES—EVIDENCE.   Evi-
dence, in an action for malicious prosecution, held to authorize
a finding of exemplary damages.   (Page 292.)

3. DAMAGES—"EXEMPLARY DAMAGES."   Exemplary, punitive, or vin-
dictive damages are such damages as are in excess of the ac-
tual loss, and are allowed where a tort is aggravated by evil
motive, actual malice, deliberate violence, oppression, or fraud.
(Page 292.)

APPEAL from the District Court, Third District; *Hon.
T. J. Lewis,* Judge.

Action by Julia Murphy against Robert L. Booth.

Judgment for plaintiff.   Defendant appeals.

AFFIRMED.

*Edwards, Smith & Price* for appellants.

*Stewart & Stewart* and *E. A. Walton* for respondent.

McCARTY, J.

On October 10, 1906, Julia Murphy, plaintiff, commenc-
ed this action in the district court of Salt Lake County
against Robert L. Booth, defendant, for malicious prosecu-
tion.   It is alleged in the complaint that:

"The defendant, falsely, wickedly and maliciously contriving and intending to injure the plaintiff in her good name and reputation, did, on the 1st day of May, 1905, go before the justice of the peace of Bingham Junction precinct, County of Salt Lake, State of Utah, and falsely and maliciously, and without any reasonable or probable cause, charge plaintiff with the crime of obtaining money under false pretenses."

Then follows a recital of the charging part of the complaint upon which the warrant for her arrest was issued, also the facts respecting her arrest and prosecution for the crime charged. It is further alleged in the complaint that plaintiff had thereby "been greatly injured in her credit and reputation, and brought into public scandal, infamy, and disgrace, and has suffered great anxiety of mind and pain of body, to her damage in the sum of ten thousand dollars. Defendant answered and denied generally the allegations of the complaint. A trial was had to a jury, who found the issues in favor of plaintiff and assessed her actual damages at $1187.50. They also awarded her exemplary damages in the sum of two thousand dollars. Defendant filed a motion for a new trial, and when the motion was heard the court announced that, in case plaintiff should consent that judgment for exemplary damages be reduced to five hundred dollars the motion for a new trial would be overruled; othewise a new trial would be granted. Plaintiff consented to the reduction, and the judgment for $1687.-50, as thus modified, was allowed to stand. To reverse the judgment, defendant has appealed.

The material facts in this case, briefly stated, are about as follows:

In 1903 the Booth Mercantile Company, a corporation, was engaged in the carrying on of a general merchandise business at Bingham Junction, Utah, and Robert L. Booth, defendant herein, was the secretary and general business manager of the corporation. This company was the owner of a certain building at Bingham Junction, the lower part, or ground floor, of which was occupied and used by it for the carrying on of its business. The balance of the building was leased to one Eugene R. Wheelan as a hotel. Wheelan

claimed to be the owner of the furniture with which the hotel was furnished. The facts and circumstances tend to show, and there is some direct evidence to that effect, that the Booth Mercantile Company had some interest in or claim against the furniture. We shall, however, for the purposes of this case, assume that Wheelan was the absolute owner of the furniture and kitchen utensils used in the hotel as the question of whether Wheelan was the sole owner or owned it jointly with the Booth Mercantile Company is, as we view the case, immaterial. Mrs. Murphy, plaintiff, came from Pocatello, Idaho, to Bingham Junction, in April, 1903. Her husband, Timothy Murphy, was a section foreman on the Oregon Short Line Railroad. Prior to Mrs. Murphy's marriage to Mr. Murphy, she had been married to one Michael Griffin, who died in 1895 and left surviving him seven children by plaintiff, all of whom were minors. The property of which the decedent died possessed consisted of real estate in Pocatello, Idaho, of the probable value of fifteen hundred dollars, all of which was, by the probate court, assigned to the widow, now Mrs. Murphy, and the seven minor children for their support and maintenance. When Mrs. Murphy came to Utah, in April, 1903, she had no property of her own. About May 10, 1903, she commenced negotiations with Wheelan for the purchase of the hotel business. Wheelan offered to sell for fifteen hundred dollars, which offer was, on or about May 24th, accepted by Mrs. Murphy. In the meantime she had had several conferences with R. L. Booth, defendant, in regard to the amount of rent she would be required to pay the Booth Mercantile Company for the part of the building occupied and used as a hotel. Booth informed her that Wheelan had been paying one hundred and twenty-five dollars per month, but that she could have the use of the hotel for one hundred and fifteen dollars per month, and if, during any month the business should prove unprofitable, the rent for such month would be reduced to one hundred dollars.

Mrs. Murphy testified that Booth told her she could occupy the building as a hotel as long as she desired. Booth, however, in his testimony, denied that he made any such statement, or that he leased the hotel to her for any specified length of time. Booth, however, promised that he would protect her in her collections for board and rooms, that the men who were boarding and rooming at the hotel were working at the smelters, and that he had arranged with the smelter companies to have the checks paid to the working men through the Booth Mercantile Company store, which would enable Mrs. Murphy to collect her board bills and rents. In closing the deal with Wheelan, Mrs. Murphy let him have some furniture that she had at her home in Bingham Junction, valued at five hundred dollars, and agreed to pay him the balance, one thousand dollars in cash. She arranged with the Booth Mercantile Company, through Booth, to pay Wheelan this one thousand dollars, and gave the company her promissory note for the amount secured by a chattel mortgage on the furniture and fixtures in the hotel. She also gave the company a mortgage on the piece of real estate in Pocatello hereinbefore mentioned. Booth testified that she represented to him that she was the absolute owner of the Idaho property, and that neither her husband nor her children had any interest in it. Mrs. Murphy, on the other hand, testified that before the mortgage was executed she stated to Booth that her children owned an interest in the property, and that he was fully advised as to the condition of the title. Soon after the mortgage was signed, Booth telephoned to Church & White at Pocatello to ascertain the value of the mortgaged property situated at that place, and was advised that it was worth fifteen hundred dollars. The two mortgages, which bore date of May 29, 1903, were duly recorded, and Wheelan received from the Booth Mercantile Company a check for four hundred and thirty dollars, being the difference between the one thousand dollars he was to receive from Mrs. Murphy and the amount that he was owing the company for merchandise purchased by him in his business during the previous month.

On or about the date the mortgages were executed, Mrs. Murphy took possession of the hotel, which consisted of a kitchen and dining room on the ground floor and twenty-five bed rooms on the upper floor of the Booth Mercantile building. She purchased her goods and supplies for the hotel from the Booth Mercantile Company. Booth collected the money as it became due Mrs. Murphy from her boarders and lodgers who worked at the smelters; he having arranged with the smelter companies to pay the men their time checks through the Booth Mercantile Company's store. From the money thus collected Booth retained one hundred and fifteen dollars per month as rental on the hotel, also the amount due from Mrs. Murphy for goods and merchandise purchased from month to month, and turned the balance of the money over to her. In August, about three months after Mrs. Murphy took charge of the hotel, Booth notified her that she would have to vacate the premises, as the Booth Mercantile Company needed more rooms for its business. Mrs. Murphy, when so notified, insisted that she was entitled to continue in possession, and that it was understood between them when she purchased the fixtures and furniture from Wheelan that she could occupy the building as long as she desired. Booth then gave her written notice to vacate and forced her to leave the premises, which she did in October, 1903. Mrs. Murphy, having no place to which she could move and use the furniture and utensils with which the hotel was furnished, asked Booth if he would take the furniture off her hands and cancel her note to the Booth Mercantile Company. This Booth refused to do, but offered to take some of it and give her credit for the same on her note. He finally took all of the furniture, except the kitchen utensils and the dining room furniture, and allowed her two hundred dollars on the note. The furniture thus retained Booth kept in the hotel and personally carried on the hotel business. Mrs. Murphy, being unable to procure another place in Bingham Junction in which to

carry on the hotel business, stored the dining room furniture and the kitchen utensils. Booth then demanded of Mrs. Murphy payment of the balance due on her note to the Booth Mercantile Company. Mrs. Murphy refused to pay the note.

As to what then transpired there is a sharp conflict in the evidence. Mrs. Murphy testified, and her testimony is corroborated by Timothy Murphy, her husband, that upon her refusal to pay the note Booth stated to her that he would put her in the penitentiary; that he had one thousand dollars to spend where she had one dollar. Booth, however, denied making any such threat or statement. Booth, as manager of the Booth Mercantile Company, brought an action in the district court of Bannock County, Idaho, to foreclose the mortgage given by Mrs. Murphy to the company on real property situated at Pocatello. Mrs. Murphy filed an answer to the complaint. A trial was had, and the district court decided the issues in favor of Mrs. Murphy. The files in that case were offered and admitted in evidence in this case. The case was carried to the Supreme Court of Idaho on appeal, and while it was pending in that court Booth went before a justice of the peace at Bingham Junction, Salt Lake County, Utah, and swore to a complaint charging Mrs. Murphy with having obtained the one thousand dollars for which the note and mortgage were given under false pretenses. A warrant was issued, and Mrs. Murphy was arrested at her home in Murray, Salt Lake County, on May 1, 1905, at about one o'clock p. m., and taken before the justice of the peace who issued the warrant. She entered a plea of not guilty, and her bond was fixed at one thousand dollars. Quoting from her testimony, which is not disputed, she says:

"I was paraded around Bingham Junction until a few minutes of 6 o'clock . . . trying to find bondsmen. . . . Finally secured a bond. . . . The sheriff was with me during all that time. . . . I took the last train home out of Bingham Junction. After getting off the train I had to walk a mile and a half and carry my baby. She was sick. My condition was not very good

when I got home that night. My two little girls and Mr. Murphy were at home when I got there." And again, referring to her arrest and prosecution, she said: "I suffered untold misery and humiliation on account of it. . . . I was very much grieved and distressed over it. . . . I couldn't do very much work, or sleep but very little."

On February 6, 1906, Mrs. Murphy had a preliminary hearing before the justice of the peace on the charge for which she was arrested. At the conclusion of the evidence for the state the case was dismissed, and Mrs. Murphy discharged. The record also shows that Booth employed counsel to assist in the prosecution of Mrs. Murphy. Booth was called as a witness for the state at the preliminary hearing, and testified that he would like to see Mrs. Murphy convicted of the crime for which she was being prosecuted.

The court among other things, charged the jury as follows:

"If you find from the evidence that the defendant caused plaintiff to be arrested for the purpose of assisting defendant in collecting a claim for moneys which defendant thought he had against plaintiff, or to compel the delivery of property, or to satisfy some grudge or hatred, or to accomplish some other ulterior or wrongful purpose, then it was begun maliciously, as though inspired by revenge."

Appellant contends that this instruction is susceptible of two constructions, one of which is supported by the facts, and the other, he insists, is not supported by any fact in the case, and that therefore the giving of the instruction was prejudicial error. In his printed brief he says:

"The jury might, under a strained construction, say that the part of the instruction referred to had reference to the payment of the money which the defendant claimed was due the corporation, but which, as a matter of fact, the instruction does not say, if properly construed, or, they might have construed the instruction as it is really worded, and say that perhaps the defendant himself made some claim that Julia Murphy was owing him money, and therefore concluded that the prosecution was commenced to assist in the collection of that money."

The evidence, without conflict, shows that Booth, appellant, was the person with whom respondent, Mrs. Murphy, transacted practically all the business connected with the leasing of the hotel and the purchase of the furniture therein, and he was the sole and only person with whom she transacted the business in relation to the giving of the note and mortgage in question. Booth, in his testimony, says: "During the times of these negotiations with Mrs. Murphy, I was secretary and manager of the business; also, a stockholder. . . . I was interested in the collection of this thousand dollars as a stockholder of the company. I had full charge of the proceedings that have been taken with reference to the collection of this money." It is not claimed nor does the record show, that any "claim for moneys" was involved in any of the transactions or proceedings out of which this action arose other than the one thousand dollars for which the note and mortgages were given. Therefore we do not think the jury could have understood the instruction to refer to some claim not mentioned or referred to in the record, and which, as a matter of fact, the record shows did not exist.

Appellant contends that "there is no evidence in this case which would justify the jury in awarding exemplary damages against defendant, and that the court erred in instructing the jury upon the question of exemplary damages." And in discussing this assignment of error counsel for appellant, in their brief, say: "Exemplary, punitive, or vindictive damages are such damages as are in excess of the actual loss, and are allowed where a tort **2, 3** is aggravated by evil motive, actual malice, deliberate violence, oppression or fraud. The law bearing on this phase of the case is so well understood that it is needless to cite authorities"—citing Words and Phrases, vol. 3, p. 2577. We think the facts in the case, tested by this rule, which we concede to be correct, fully warranted the jury in awarding exemplary damages, and the court did not err in submitting this question to them.

The court very carefully and fully instructed the jury upon the questions of law applicable to the facts in this case, and the instructions, when read and considered together, are as favorable to the defendant as the facts in the case warrant.

Judgment is affirmed, with costs to respondent.

STRAUP, C. J., and FRICK, J., concur.